**UNITED STEELWORKERS OF AMERICA, LOCAL UNION 5790, Appellant,**

v.

**INDUSTRIAL COMMISSION of Missouri et al., Respondents.**

**No. 25171.**

Kansas City Court of Appeals, Missouri.

June 1, 1970.

Motion for Rehearing or to Transfer to Supreme Court Denied Oct. 5, 1970.

Application to Transfer to Supreme Court Denied Nov. 6, 1970.

Roberts & Roberts, Raymond R. Roberts, Farmington, for appellant.

Lloyd G. Poole, Jefferson City, for Industrial Commission of Missouri.

Curtis K. Cochell, Jefferson City, for Division of Employment Security.

HOWARD, Judge.

This is an appeal from a judgment of the circuit court of Cole County, Missouri, affirming a finding of the Industrial Commission that the appellant local union was an employer within the meaning of Section 288.032. R.S.Mo.1959, as amended, V.A.M.S. This determination of the Commission was based upon a finding that the local union had in employment four or more individuals for some portion of a day in each of twenty different calendar weeks in the appropriate period. This finding carries with it an obligation on the union to make contributions to the unemployment compensation fund as provided in the Missouri Employment Security Act. Appellant has duly appealed to this court.

It appears to be uncontested that the union president (who was also chairman of the grievance committee), the recording secretary and the financial secretary were paid for their activities as such officers in a manner which would constitute employment. It is also not contested that the union made payments to various members of the union under circumstances which would qualify it as an employer if these payments were, in fact, made for services rendered to the union and such individuals actually occupied the status of employees of the union. The determination of the Commission was not based upon payments made to any one or more named individuals but was based upon payments made by the union to various groups of its members.

The local union is the collective bargaining agent for the employees of Meramec Mining Company (a subsidiary of St. Joseph Lead Company) which operates the Pea Ridge Iron Mine in Washington County, Missouri. It appears that various union members received payments from the union in connection with various activities; some as members of the grievance committee; some as witnesses at the grievance proceedings, including arbitration; some as members of the negotiating committee negotiating a new collective bargaining contract; others for attending union conventions and schools conducted by others with the cooperation of the union; and some as test observers. If these activities constituted employment by the union and if the payments made by the union were made for personal services, then the determination of the Commission must be affirmed. Otherwise, it must be reversed.

There is no material conflict in the evidence or dispute as to the basic facts. The only dispute is as to the permissible in-

ferences or conclusions to be drawn from these evidentiary facts.

It appears that under the collective bargaining contract, the union maintains a grievance committee, the members of which assist the employees of Meramec Mining Company when they believe that the company has acted in violation of the contract. This grievance procedure is detailed in the contract and goes from a rather informal discussion of the matter with the worker's foreman through three intermediate steps and culminates in arbitration. At the various steps of this grievance procedure, witnesses may be called to give evidence of the circumstances involved. The collective bargaining agreement specifically gives the grievant a right to call witnesses but also specifically provides that the company will not pay wages for time lost from work for the purpose of testifying on behalf of the grievant. In the event the member of the grievance committee or the grievant or witnesses called in his behalf lose time from their regular work, they are reimbursed by the union.

During the negotiation of a new collective bargaining contract, the members of the union negotiating committee met the negotiators representing the company on numerous occasions. In connection with some of these meetings, the members lost time from their regular work with the company. The union reimbursed them for the wages so lost.

The local union sends delegates to conventions of the union and attendance at such conventions necessarily results in the representative losing time from his regular work. The union reimburses such delegates for the wages lost by reason of their absence from work to attend the convention. The union also authorizes certain of its members to attend various "schools" or educational meetings. These deal with the general field of the individual laborer's rights under various laws, such as workmen's compensation. The union reimburses those attending such schools for wages lost by reason of being absent from regular work to attend the school.

The collective bargaining contract provides for a system of "bidding" for vacancies in better jobs or in new jobs. These shifts from job to job are based upon ability to perform the work and upon physical fitness, and then upon seniority. In connection with ability to perform the work, the company gives tests in order to gauge the ability of the person desiring the promotion. These tests are also given in some crafts for the purpose of determining advancement from grade to grade within the craft. In connection with the giving of these tests, the members of the craft within the union select individuals who are called test observers. These observers observe the giving of the test and the grading of the test. Their purpose is to insure that the tests are fairly and impartially given and graded. Such test observers are reimbursed by the union for time lost from their regular work.

As to all of these activities, the particular union member may be absent from work and thereby lose wages for the work that he would otherwise have performed. The union reimburses him for such lost wages. Further, if traveling is involved, the union will reimburse the member for his travel expenses. The mine is located in a relatively sparsely settled area and the employees habitually travel to and from work in car pools. If the activities here under consideration require the individual to arrive at the mine or to leave at a time different from the schedule of the car pool, it is then necessary for the individual to drive his own car. The union also reimburses him for this expense which he would not otherwise incur.

In all of these activities, the individual may or may not lose time from his regular work for the company. If he is absent from work he is not paid by the company. It is only when he loses work and therefore loses part of his pay that the union reimburses him. The members of the griev-

ance committee, who testified, indicated that they regularly arrive at the mine early before their shift and performed services in connection with the grievances of the workers. They also performed such services after their regular shift was over and often at home and on their days off. They were not paid by the union for any of this time. They only received money from the union when their activities in connection with grievances caused them to lose time from their regular employment at the mine. Likewise, witnesses at the grievance hearings often found it necessary to be absent from their regular work. They thereby lost wages which were reimbursed by the union.

The evidence is that the union did not pay money to these union members at a rate the union specified for the activities in question. Rather, it paid the members for time lost according to the pay they would have received from the company if they had worked for the company instead of being absent in order to pursue these union activities. The contract reveals a pay scale range from $2.385 to $4.095. Thus, if we have two witnesses at a grievance proceeding, each of whom lost one hour from his regular work, one of whom was in the highest pay scale and the other in the lowest pay scale, one would receive from the union $2.385, whereas the other would receive from the union $4.095, for identical functions. Furthermore, it appears that the mine during this period was operating on regular overtime. Thus, in the case of the two witnesses at the same hearing, if one was on overtime, he would be paid by the union at his time-and-a-half rate; whereas, if the other was not on overtime, he would be paid his regular scale. Also, the contract provides for shift differentials and Sunday premium. If one witness were entitled to a shift differential, the union would pay it. If the other witness were not entitled to a shift differential, the union would pay only his regular pay scale. If any of these activities were carried on at a time when the

individual would not regularly be working, the union would not pay him anything. It often happened that an individual might devote (as an example) four hours to an activity. He would lose the last two hours from his regular shift but the next two hours were time when he would not regularly work. The union would pay for the first two hours but not the second two hours, for the same activity. If the activity was conducted on his day off, the union would not pay him anything.

During this period, the company gave a retroactive pay raise. The union then went back and paid the additional money for the retroactive period to those members who had lost time from regular work because of the described activities.

From the foregoing, it is apparent that the moneys paid by the union to its various members for these described activities were not measured by the time spent on such activities by the individual or by the quality of the services performed by the individual. Rather, they were measured solely and only by the money lost by the individual by reason of being absent from work and thereby losing his wages from the company. The union also reimbursed expenses when they were incurred by the individual. It is apparent that the practice was designed to make the individual whole and to place him in the same financial position he would have been in had he worked for the company in normal course instead of absenting himself from work to perform these functions. The union only paid an amount equal to what the individual was out of pocket. It paid different amounts to different people performing the same functions based solely and only on the amount they would have received if they had worked their regular time for the company and it paid them nothing for the services performed if they did not lose any time from their regular work.

On the basis of this evidence, the Commission concluded that this constituted employment within the meaning of the statute

and that the union was an employer of four or more people on one or more days in the required number of weeks during the base period. It concluded that the payments made by the union were "wages" as defined by the law. These conclusions were based on the following declarations: "The controlling factor is that such remuneration was paid by the Union for services performed for the Union rather than the Company"; "all money paid out by the Local Union from its treasury must be approved by the members at a local union meeting, such requirements implying control over the services performed by the Union and its members"; "the real reason for these payments was due to the fact that the members absented themselves from their work with the Company in order to perform personal services in behalf of and to the benefit of the Union and its members."

The fact that the members of the local union must approve all disbursements from the union treasury does not in any way imply control by the union over the services performed by the payees. This conclusion reached by the Commission is untenable. The conclusion of the Commission that the moneys paid by the union constituted wages paid "for services performed for the union" is the nub of this case. The Missouri Employment Security Law in section 288.034, R.S.Mo.1959, as amended, V.A.M.S., defines the word "employment" as services performed for wages or under any contract of hire, written or oral, express or implied. By section 288.-036, wages are defined as all remuneration payable or paid, for personal services. These are the two ends of the same stick. You cannot have one without the other. The services must be performed for wages and the wages must be paid for the services rendered. Here, two people performing the same services might be paid different "wages", not because of a difference in the value of the services but because of a difference in the rate of pay they received in their regular employment with the mining company. Likewise, the two individuals performing the same services might be paid in different amounts because one was entitled to overtime or a shift differential and the other was not. The amount of the payment by the union was not measured by the services performed. It is measured by time lost from regular employment with the mining company and the consequent amount of wages lost. If the individual lost no time with the mining company, he received no pay from the union no matter how long he worked or how valuable his services were. The conclusion is inescapable that these payments were made for the sole purpose of keeping the union member from losing money, not for the purpose of compensating him for services performed. This scheme of payment for time lost undoubtedly made it easier to secure the performance of these functions. If the member were going to lose part of what he would otherwise have in his paycheck, he would be more reluctant to perform these services at a time when they needed to be performed, if performance would result in him losing time from his regular work. This does not mean that there would be any more difficulty in securing services by individuals when they were not regularly scheduled to work. It would be unrealistic to say that the individuals performed these services for "wages" when, by reason of considerations completely outside of the nature of the services performed, he might be paid for part, all, or none, of the hours which were used in such services. Conversely, it would be unrealistic to say that the "wages" were paid for the services performed when they paid for part, all, or none, of the hours spent in performing the services and when they paid two individuals different amounts (or nothing) for the same services requiring the same amount of time. We can, therefore, only conclude that the record in the case at bar does not contain competent and substantial evidence supporting the conclusion of the Commission.

As to this phase of the case, the Commission cites and relies on the Florida case

of Communications Workers of America, Local 3107 v. Florida Industrial Commission, Fla.App., 174 So.2d 751, and the Wisconsin case of International Union, United Automobile, Aircraft & Agricultural Implement Workers of America, Local 180, C.I.O. v. Industrial Commission, 248 Wis. 364, 21 N.W.2d 711. The opinion of the Florida Court of Appeals merely quoted the decision of the Florida Industrial Commission and stated that they ageed therewith. The decision of the Commission does not summarize the evidence but states facts only in the form of conclusions and these conclusions are so framed as to require the result reached. This does not, in fact, rise to the stature of judicial precedent and is certainly not persuasive. Furthermore, the decision does not address itself to the precise issue here decided. The Wisconsin case concludes that the payments there made by the union did constitute wages and that the union was an employer. However, the facts are not sufficiently set out to demonstrate that they are comparable to the evidence in the case at bar and the court gave no reason for its conclusion. We are, therefore, not persuaded to follow either of these decisions because they are not applicable to the issue here presented.

· In view of the foregoing, we do not deem it necessary to discuss the other contentions of appellant. We might note that the briefs do not cite and our own research has not revealed any case on this precise point. However, the wording of the statute requires this conclusion. We, therefore, find that the decision of the Commission is not supported by substantial and competent evidence on the record as a whole. It, therefore, follows that the judgment of the trial court is reversed and the cause remanded with directions to remand this proceeding to the Industrial Commission for further proceedings in accordance with this opinion.

All concur.